# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| DRUMMOND COAL SALES, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No.: 2:16-cv-00345-SGC |
| ) | |
| KINDER MORGAN OPERATING LP ) | |
| "C", ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER[1]

This matter, which concerns a long-term contract to import coal, adds a modern twist to the expression "carrying coals to Newcastle."  While the idiom of British origin refers to the futile act of attempting to bring coal to a market saturated with the product of local mines, this case presents additional indicia of futility.  Indeed, the complaint describes the act of carrying coal to a Newcastle governed by regulations effectively prohibiting the importation of coal.

The plaintiff, Drummond Coal Sales, filed its complaint on February 26, 2016, seeking declaratory relief.  (Doc. 1).  The defendant, Kinder Morgan Operating L.P. "C" has moved to dismiss all of Drummond's claims.  (Doc. 10).  The motion is fully briefed and is ripe for adjudication.  (Docs. 16, 20, 32).  On

---

[1] The parties have unanimously consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c).  (Doc. 17).

June 13, 2017, the undersigned conducted a hearing on the motion.  For the reasons that follow, the motion to dismiss is due to be granted in part and denied in part.

## I.    FACTS

Drummond markets and sells coal directly through its affiliates.  (Doc. 1 at 2).  Most of the coal is mined in Columbia by a Drummond affiliate.  (*Id.* at 2).  Kinder Morgan owns the Shipyard River Terminal ("River Terminal") at the Port of Charleston, South Carolina.  (*Id.* at 3).  On May 13, 2005, Drummond and Kinder Morgan entered into a long-term contract to handle Drummond coal from Columbia to end users—primarily coal-fired power plants—via rail.  (*Id.*).  The contract consists of multiple components, including a Master Service Agreement and associated schedules.  (*Id.*).  One of the schedules addresses coal imported through the River Terminal, while another schedule applies to coal delivered to a different Kinder Morgan facility in Newport News, Virginia.  (*Id.*).  At issue here is the schedule ("Schedule") pertaining to the River Terminal.  (*Id.*).[2]

The initial term of the Schedule ran from May 13, 2006, through May 13, 2016.  (Doc. 1 at 3).  The complaint alleges Kinder Morgan was aware that: (1) the purpose of the Schedule was to import Columbian Coal through the River Terminal for rail delivery to power plants; and (2) contemporaneously, Drummond

---

[2] Although not attached to the complaint, the court can consider the Master Service Agreement and Schedule, which were attached to Kinder Morgan's motion, on a motion to dismiss because the documents are central to Drummond's claims and Drummond has not challenged their authenticity.  *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005).

was negotiating a rail contract with Norfolk Southern Railway to carry the coal from the River Terminal to various power plants. (*Id.*). Indeed, execution of a contract with Norfolk Southern was a condition for Drummond's performance of the Schedule. (*Id.*).

Under the Schedule, Kinder Morgan agreed to handle up to 4,000,000 tons of coal per year, and Drummond agreed to import a minimum of 3,111,111 tons per year. (Doc. 1 at 4). If Drummond did not deliver the minimum tonnage in a given year, the Schedule provided for shortfall payments to Kinder Morgan. (*Id.*).[3] In the event Drummond could not deliver the minimum tonnage, Kinder Morgan agreed to handle coal from third-parties to be credited against the minimum requirement. (*Id.*).[4]

For several years, Drummond imported coal through the River Terminal and paid any applicable penalties when it failed to deliver the minimum tonnage. (Doc. 1 at 4). However, the complaint alleges:

> Over the last several years [] the Environmental Protection Agency (EPA) and various other government agencies have proposed and implemented stringent environmental rules and regulations that greatly impacted the consumption of coal by power plants and other end users in the United States.

---

[3] The Schedule reveals that, in the event Drummond could not deliver the minimum tonnage of coal, it could meet its obligations by substituting petroleum coke for coal. (Doc. 10-1 at 28-29).

[4] The Schedule also reveals that Kinder Morgan agreed to make certain improvements to the River Terminal to accommodate the expected volume of imported coal. (Doc. 10-1 at 27-28).

3

(*Id.*).  The complaint also asserts that, since 2010, approximately 40% of U.S. coal-fired power plants have been retired.  (*Id.* at 5).  Drummond contends the recent environmental regulations have been especially harsh on power plants which would have received coal imported through the River Terminal.  (*Id.*).  In this vein, the complaint alleges "[m]ore than half of the power plants identified in the Norfolk Southern contract have either closed completely or no longer burn coal [and that the] power plants still in operation have substantially reduced their use of coal as a fuel source."  (*Id.*).

Drummond further states that, due to new environmental regulations, "the market for imported coal in the relevant area, which was the entire purpose of the Schedule, has essentially ceased to exist" and that, since at least 2011, "Kinder Morgan has not handled a single ton of coal" at the River Terminal.  (Doc. 1 at 5).  The Schedule requires Drummond to provide Kinder Morgan with periodic, non-binding estimates of the amount of coal it anticipates delivering to the River Terminal; from 2011 through 2015, Drummond estimated it would deliver no coal to the River Terminal.  (*Id.* at 5-6).  Accompanying these estimates were Drummond 's requests that Kinder Morgan would work "to find additional volumes and tonnage to bring through the terminal."  (*Id.* at 6).

Each year, Kinder Morgan sent invoices to Drummond regarding the shortfall payments for failure to meet the minimum tonnage.  (Doc. 1 at 6).  From

2011 through 2014, Kinder Morgan sent shortfall payment invoices totaling $52,422,220.35, which Drummond paid. (*Id.* at 6). The complaint alleges that: (1) from 2011 through 2014, Kinder Morgan handled no coal at the River Terminal from any source; (2) during 2015, Kinder Morgan handled no coal at the River Terminal under the Schedule; and (3) on January 29, 2016, Kinder Morgan sent Drummond an invoice for the 2015 penalty payment in the amount of $13,782,221.73. (*Id.* at 7). A subsequent filing reflects the total outstanding balance is now $23,464,407.19. (Doc. 26 at 2). Finally, the complaint alleges that in 2015, the River Terminal's total annual capacity was only 2,500,000 tons, which is below the minimum tonnage threshold set forth in the Schedule. (Doc. 1 at 11-12).

Based on these allegations, Drummond asserts four claims for declaratory relief: (1) frustration of purpose; (2) force majeure; (3) impossibility or impracticability of performance; and (4) excused performance due to Kinder Morgan's inability to perform. (Doc. 1 at 7-12). On each of these theories, Drummond seeks a declaration that it is not required to satisfy the minimum tonnage requirements or remit the penalty payment for calendar year 2015 or the remaining term of the Schedule. (*Id.* at 8, 10-12).

## II.    STANDARD OF REVIEW

To survive a motion to dismiss for failure to state a claim on which relief may be granted pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).   "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."   *Id.* (*citing Twombly*, 550 U.S. at 556).   "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."   *Id.*   "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'"   *Id.* (quoting *Twombly*, 550 U.S. at 557).

"Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the … claim is and the grounds upon which it rests.'"   *Twombly*, 550 U.S. at 555 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).   Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the defendant-unlawfully-harmed me accusation."   *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).   "[L]abels and conclusions,"

"a formulaic recitation of the elements of a cause of action," and "naked assertion[s] devoid of further factual enhancement" are insufficient. *Id.* (quoting *Twombly*, 550 U.S. at 555, 557) (internal quotation marks omitted).

## III.  DISCUSSION

The Master Service Agreement includes a choice of law provision for New York law. (Doc. 10-1 at 12). Accordingly, New York law will govern the substantive arguments presented here. Before reaching the merits of the parties' arguments, the court will address Drummond's contention that Kinder Morgan's arguments are inappropriately raised on a Rule 12(b) motion.

### A.    Propriety of Addressing Arguments on a Motion to Dismiss

Drummond's claims for impossibility and frustration of purpose share the common requirement of pleading that the parties' contract expectations were frustrated or destroyed by unforeseeable events. Drummond contends the question of foreseeability is a fact-intensive inquiry which is inappropriate on a motion to dismiss. (*See* Doc. 16 at 9-11). In a similar vein, the response to the motion to dismiss attacks Kinder Morgan's characterization of Drummond's claims as seeking to avoid contract terms simply because they are no longer profitable. (*Id.* at 13). Drummond contends acceptance of this argument regarding economic viability would require the court to make inferences in favor of Kinder Morgan;

Drummond argues such inferences are impermissible on a motion to dismiss because economic considerations are not pled in the complaint.  (*Id.*).

It is worth noting that the complaint repeatedly alleges environmental regulations have negatively impacted the market for coal.  (Doc. 1 at 4) (environmental regulations have "greatly impacted the consumption of coal"); (*id.* at 5) ("due to these environmental regulations, the market for imported coal in the relevant area . . .  has essentially ceased to exist"); (*id* at 6) (citing "decimation of the import coal market").  Moreover, two of Drummond's claims explicitly rest, at least in part, on financial arguments concerning the market for imported coal.  (*See id.* at 7) (in support of frustration of purpose, alleging the Schedule has "become virtually worthless" to Drummond); (*id* at 10) (in support of impossibility, alleging it "has become commercially impracticable for [Drummond] to meet its minimum tonnage requirements").  Accordingly, accepting the facts alleged in the complaint as true, Drummond's claims are at least partially based on financial considerations due to shifts in the coal market.

As to a determination of foreseeability at the motion to dismiss stage of litigation, Drummond quotes *Lowenschuss v. Kane*, 520 F.2d 255, 265-66 (2d Cir. 1975), holding that:

> Resolution of the defense of impossibility requires an examination into the conduct of the party pleading the defense in order to determine the presence or absence of such fault.  In all but the clearest cases this will involve issues of fact that must be resolved by the

district court only after the parties have had adequate opportunity to investigate and present their evidence.

(Doc. 16 at 12) (emphasis omitted).  At issue in *Lowenschuss* was whether the party pleading impossibility was at fault in bringing about the events alleged to have made performance impossible.  Here, Kinder Morgan's motion to dismiss is not premised on an argument that Drummond's actions caused the bottom to drop out of the market for imported coal.  It is undisputed that the parties are faultless in this regard.  Instead, Kinder Morgan contends Drummond's claims fail as a matter of law.  Drummond cites no law excusing a plaintiff from pleading the essential elements of its claims; the undersigned is unaware of any such authority. Likewise, as noted by Kinder Morgan, other courts applying New York law have dismissed similar claims on Rule 12(b) motions.  (Doc. 20 at 20) (*citing Gander Mountain Co. v. Islip U-Slip, LLC*, 923 F. Supp. 2d 351 (N.D.N.Y. 2013), *aff'd,* 561 F. App'x 48 (2d Cir. 2014) (granting 12(b)(6) motion regarding claim for frustration of purpose where plaintiff failed to plead unforeseeability); *Burke v. Steinmann*, No. 03-1390, 2004 WL 1117891 at *9 (S.D.N.Y. May 18, 2004) (dismissing counterclaims for frustration and impossibility for failure to state a claim)); *see Urban Archaeology Ltd. v. 207 E. 57th St. LLC*, 951 N.Y.S.2d 84 (N.Y. App. Div. 2009).

Drummond also notes that the majority of cases relied on by Kinder Morgan addressed motions for summary judgment.  Drummond contends this further

bolsters its argument that adjudication of its claims on a motion to dismiss is premature.  Aside from the fact, noted above, that courts applying New York law have disposed of similar claims on motions to dismiss, it is not surprising that most cases addressing the doctrines of impossibility, frustration, and force majeure arose at summary judgment.  These theories are typically presented as defenses to claims for breach of contract and would be addressed on summary judgment in the typical case.  The nature of declaratory judgment relief turns this model on its head.  But a plaintiff seeking declaratory relief still bears the burden of stating a claim.  *See Alders v. Afa Corp. of Florida*, 353 F. Supp. 654, 657 (S.D. Fla. 1973), *aff'd,* 490 F.2d 990 (5th Cir. 1974)

Based on the foregoing, the court may properly consider these arguments on a motion to dismiss.

**B.     Unforeseeability**

In determining whether a particular event is foreseeable, New York courts have looked to the sophistication of the parties.  *Pleasant Hill Developers, Inc. v. Foxwood Enter., LLC*, 885 N.Y.S. 2d 531, 534, (N.Y. App. Div. 2009); *Urban Archaeology*, 951 N.Y.S.2d 84 (holding on a motion to dismiss that sophistication of the parties foreclosed application of doctrine of impossibility).   Here, the complaint indicates the parties are both sophisticated business entities, and Drummond does not dispute Kinder Morgan's characterization of the parties as

sophisticated.    The Master Service Agreement and Schedule on which the complaint is based further reveal the parties' sophistication.

As Kinder Morgan notes, courts outside of New York have found that regulatory changes are foreseeable as a matter of law.  (Doc. 20 at 9) (quoting *Sabine Corp. v. ONG W., Inc.,* 725 F. Supp. 1157, 1177 (W.D. Okla. 1989)). Additionally, New York courts considering whether regulatory changes affecting contracts give rise to an impossibility defense have generally answered in the negative.  *See Pleasant Hill Developers,* 885 N.Y.S.2d at 534 (sophisticated developers claiming impossibility based on amended zoning regulations which prohibited planned development could have foreseen or guarded against possibility of amended zoning regulations); *Rooney v. Slomowitz*, 784 N.Y.S.2d 189, 193 (N.Y. App. Div. 2004) (difficulty in obtaining governmental permits necessary for constructing road were foreseeable); *Beardslee v. Inflection Energy, LLC*, 904 F. Supp. 2d 213, 221 (N.D.N.Y. 2012), *aff'd,* 798 F.3d 90 (2d Cir. 2015) (finding regulatory changes regarding hydraulic fracturing were foreseeable).

Here, regardless of whether the EPA regulations at issue were foreseeable *per se*, the inescapable fact is that the Master Service Agreement does contemplate the potential for regulatory agencies to impose new regulations affecting the parties' contract expectations.  As noted by Kinder Morgan, paragraph 12 of the Master Service Agreement provides that "regulatory bodies may cause KINDER

MORGAN to incur additional cost or expense to comply with applicable Regulations" regarding operation of the River Terminal, including environmental regulations. (Doc. 10-1 at 9). The provision allocates the risks of such costs in excess of $300,000 to Drummond. (*Id*. at 9-10). Drummond contends this provision "has absolutely nothing to do with the severe changes in governmental regulation of coal-fired power plants, and has no bearing on whether the parties foresaw those changes." (Doc. 16 at 16 n.8).

The Master Service Agreement anticipates that environmental regulations could affect the parties' contract expectations. While it is true that paragraph 12 applied to protect Kinder Morgan against the increased cost of environmental and other possible regulations, its inclusion proves the parties contemplated their impact on the contract. The court accepts Drummond's allegation that it did not foresee the promulgation of certain EPA regulations. But the regulations were not unforeseeable. In light of the authority discussed above, as a matter of New York law, the sophisticated parties here could have anticipated that new environmental regulations could affect the market for imported coal.[5] *See Gen. Elec. Co. v. Metals Res. Grp. Ltd.*, 741 N.Y.S.2d 218, 220 (N.Y. App. Div. 2002) (rejecting

---

[5] While Drummond makes a passing request to amend the complaint (Doc. 16 at 11, n.4) to include a specific allegation that the unspecified environmental regulations were unforeseeable, any such amendment would be futile. Amending the complaint to add an explicit allegation of "unforeseeability" in the complaint would amount to a conclusory statement. In light of the circumstances of this case and the authority discussed above, new environmental regulations were foreseeable as a matter of law.

impossibility defense based on increase in commodity price, finding that "financial disadvantage to either of the contracting parties was not only foreseeable but was contemplated by the contract, even if the precise causes of such disadvantage were not specified").

As a result, Drummond cannot state a claim for relief under the theories of impossibility and frustration of purpose. *See A & S Transp. Co. v. Cty. of Nassau*, 546 N.Y.S.2d 109, 111–12 (N.Y. App. Div. 1989) ("performance of a contract will be excused if such performance is rendered impossible by intervening governmental activities, but only if those activities are unforeseeable . . . [W]hen a governmental action is foreseeable, a contractor may not invoke 'impossibility' to excuse performance").

Drummond also argues that, even if environmental regulations are foreseeable in the abstract, the extent of their impact may be unforeseeable. (Doc. 16 at 14-15). This argument principally relies on *Kolodin v. Valenti*, 979 N.Y.S.2d 587 (N.Y. App. Div. 2014), which concerned a recording contract between a musician and her manager. When the parties' personal relationship soured to the point that they entered into a stipulated order prohibiting any contact, the court found the degree of the schism was unforeseeable and that performance of the contract was no longer possible. *Id.* at 591. Here, the facts are distinguishable from those presented *Kolodin*. Even accepting the allegations in the complaint as

13

true, the fact remains that coal-fired power plants continue to operate in the area serviced by the terminal.  This stands in stark contrast to a recording contract in which the musician and her manager were prohibited from having any contact.

For the foregoing reasons, the environmental regulations on which Drummond's claims for impossibility and frustration of purpose are premised were foreseeable as a matter of law.  Each of Drummond's individual claims are discussed in more detail below.

### C.   <u>Impossibility</u>

Under New York law, a party to a contract generally "must perform or respond in damages for its failure, even when unforeseen circumstances make performance burdensome." *Kel Kim Corp. v. Cent. Markets, Inc.*, 519 N.E.2d 295, 296 (1987).  A party's performance of contractual obligations may be excused under the doctrine of impossibility:

> only when the destruction of the subject matter of the contract or the means of performance makes performance objectively impossible. Moreover, the impossibility must be produced by an unanticipated event that could not have been foreseen or guarded against in the contract

*Kel Kim*, 519 N.E.2d at 296.  Government action can render performance impossible, but only if the action was not foreseeable. *See A & S Transp. Co.*, 546 N.Y.S.2d at 111–12.  Additionally, a party pleading impossibility "must demonstrate that it took virtually every action within its powers to perform its

14

duties under the contract." *Kama Rippa Music, Inc. v. Schekeryk*, 510 F.2d 837, 842 (2d. Cir. 1975).  However, impossibility is "applied narrowly, due in part to judicial recognition that the purpose of contract law is to allocate the risks that might affect performance and that performance should be excused only in extreme circumstances." *Kel Kim*, 519 N.E.2d at 296.  Accordingly, impossibility is rarely applied to excuse contractual obligations under New York law.  *Lagarenee v. Ingber*, 710 N.Y.S.2d 425, 428 (N.Y. App. Div. 2000).

Here, in addition to its failure to allege unforeseeability—and the necessary conclusion that the risk of new regulations could have been foreseen and addressed in the contract—the complaint fails to allege other critical elements of impossibility.  First, the complaint does not plausibly state that the subject matter of the contract has been destroyed.  *Kel Kim*, 519 N.E.2d at 296.  Neither does the complaint plausibly state that performance of the contract is "objectively impossible." *Id.*  Indeed, the complaint notes that coal fired power plants continue to operate in the area that would receive coal from the Terminal.  Instead, the complaint states that environmental regulations negatively affected the market for imported coal; it further notes that importing coal would be financially burdensome.  Under New York law, financial hardship and market swings do not serve as grounds for eviscerating a contract due to impossibility.  *See Metals Resources Group*, 741 N.Y.S.2d 218 (N.Y. App. Div. 2002); *Bank of New York v.*

*Tri Polyta Finance B.V.,* No. 01-9104, 2003 WL 1960587 at *4-*5 (S.D.N.Y. Apr. 25, 2003); *Urban Archaeology,* 951 N.Y.S.2d 84.

Next, as noted by Kinder Morgan, the complaint fails to allege that Drummond exhausted all avenues of performing its contractual duties. As previously noted, the Schedule provides Drummond could cure any shortfall in imported coal by delivering petroleum coke instead. (Doc. 10-1 at 28-29). The complaint is silent as to this provision of the Schedule and to any attempts by Drummond to meet its obligations via petroleum coke. Likewise, Drummond has not responded to Kinder Morgan's arguments regarding substitution of petroleum coke. (*See generally* Doc. 16). Accordingly, Drummond has not pled or otherwise argued "that it took virtually every action within its powers to perform its duties under the contract." *Schekeryk*, 510 F.2d at 842.

Any of the foregoing shortcomings—failure to plead unforeseeability, objective impossibility, or exhaustion of all avenues of performance—would provide independently sufficient grounds for dismissal of the claim for impossibility.[6] Accordingly, Drummond's claim for impossibility is due to be dismissed for failure to state a claim.

---

[6] Kinder Morgan's reply also presents compelling arguments citing non-controlling law calling into question whether the doctrine of impossibility could ever apply to a contract like the one at issue here, where Drummond can perform its duties in one of two ways: (1) importation of the minimum tonnage of coal and/or petroleum coke; or (2) by making shortfall payments when it did not meet the minimum requirements. (*See* Doc. 20 at 12-13). However, because Kinder

### D.    **Frustration of Purpose**

The doctrine of frustration of purpose is applied narrowly and only when the frustration is "substantial." *Crown It Services v. Koval–Olsen,* 782 N.Y.S.2d 708, 711 (N.Y. App. Div. 2004).    "Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary."   Restatement (Second) of Contracts § 261. Under New York law, the doctrine of frustration of purpose discharges a party's contractual duties where "an unforeseen event has occurred, which, in the context of the entire transaction, destroys the underlying reasons for performing the contract, even though performance is possible." *Sage Realty Corp. v. Jugobanka, D.D.,* No. 95-0323, 1997 WL 370786, at *1–2 (S.D.N.Y. July 2, 1997) (citations omitted).   The events justifying application of frustration of purpose must be "virtually cataclysmic" and "wholly unforeseeable" and must "render[] the contract valueless to one party." *U.S. v. Gen. Douglas MacArthur Senior Vill.,* 508 F.2d 377, 381 (2d Cir.1974).   However, the fact that an event may cause a party to realize lower profits or sustain a loss is insufficient to justify application of frustration. *See Rockland Dev. Assoc. v. Richlou Auto Body, Inc.,* 570 N.Y.S.2d

---

Morgan raised these arguments for the first time on reply, and because the claim for impossibility is due to be dismissed for other reasons, these arguments will not be considered.

343 (N.Y. App. Div. 1991); *Tri Polyta Fin.*, 2003 WL 1960587, at *4 (S.D.N.Y. 2003) ("Where impossibility or difficulty of performance is occasioned only by financial difficulty or economic hardship, even to the extent of insolvency or bankruptcy, performance of a contract is not excused.") (alterations incorporated) (citations omitted).

As with impossibility, a party claiming frustration must show it could not have "anticipated and guarded against" the frustrating event. *Jugobanka,* 1998 WL 702272 at *4. "[I]f a party could reasonably foresee an event that would destroy the purpose of the contract, and did not provide for the event's occurrence, then that party will be deemed to have assumed the risk." *Id*. at *4 n.4. "If a contingency is reasonably foreseeable and the agreement nonetheless fails to provide protection in the event of its occurrence, the defense of commercial frustration is not available." *Gander Mountain*, 923 F. Supp. 2d at 360, (citing *Jugobanka,* 1998 WL 702272 at *3). As with impossibility, courts applying New York law consider the sophistication of the parties when evaluating a claim of frustration. *Id.*

Given the foregoing conclusion that environmental regulations affecting coal burning power plants were foreseeable as a matter of law, Drummond's claim for frustration of purpose fails. Moreover, the Schedule allocates risks of a market shift. The Schedule's plain terms operate to protect Kinder Morgan's investments

in improvements in the River Terminal by guaranteeing it can collect fees for handling a minimum of 3,111,111 tons of coal per year, either by actually handling the ore or via shortfall payments.  In turn, the Schedule protects Drummond by: (1) fixing a price for processing its coal, ensuring its costs would not escalate unexpectedly over the ten-year term of the contract; and (2) providing an alternative means of performing by importing petroleum coke.  The contract allocated risks for environmental regulations affecting Kinder Morgan and assigned those risks to Drummond.  Drummond is a sophisticated entity with unquestioned experience entering into contracts of this nature.  Here, the contract was silent as to the risks of environmental regulations affecting Drummond.  By this silence Drummond assumed those risks as a matter of New York law.

For the foregoing reasons, Drummond's claim invoking frustration of purpose is due to be dismissed for failure to state a claim.

### E.    Force Majeure

Like the doctrines of impossibility and frustration of purpose, force majeure clauses excusing nonperformance due to circumstances beyond the control of the parties are narrowly construed under New York law.  *Kel Kim*, 519 N.E. 2d at 296-97.  Generally, performance will only be excused if the contract includes the specific event that actually prevents performance.  *Id.*; *Beardslee,* 904 F. Supp. 2d at 220 ("a force majeure clause must include the specific event that is claimed to

have prevented performance").  When examining force majeure clauses, New York courts do not give expansive meaning to events included in the clauses; "they are confined to things of the same kind or nature as the particular matters mentioned." *Kel Kim*, 519 N.E. 2d at 297.

Here, the Master Service Agreement defines a force majeure event as one outside the parties' control and including:

> without limitation, any act of God or of a public enemy or terrorist act, labor troubles, strikes, lockouts, riots, nonavailability of machinery, embargoes, blockades or interventions or expropriations by government or governmental authorities, interference by civil or military authorities or other civil unrest, [or] failure or delay of manufacturers or suppliers to deliver machinery or equipment . . . .

(Doc. 10-1 at 6).  Kinder Morgan contends the complaint fails to state a claim under the force majeure clause because: (1) the environmental regulations were foreseeable; (2) narrowly construed, the clause does not enumerate events similar in nature to environmental regulations; and (3) the environmental regulations did not force or prohibit importation of coal, but instead merely prompted Drummond's decision to stop importing coal through the River Terminal.  (Doc. 10 at 17-19). Each argument is addressed in turn.

As an initial matter and as noted by Drummond, unforeseeability is not a requirement of the force majeure clause at issue here.  *Starke v. United Parcel Service, Inc.,* 898 F. Supp. 2d 560, 568-69 (E.D.N.Y. 2012), *aff'd*, 513 F. App'x 87 (2d Cir. 2013) (refusing to read an unforeseeability requirement into a force

majeure clause that was silent as to foreseeability of triggering events). Accordingly, that environmental regulations were foreseeable does not foreclose force majeure relief.

Next, Drummond relies on a pared-down reading of the provision defining a force majeure event as "without limitation, any . . . interventions . . . by government or governmental authorities [or] interference by civil authorities." (Doc. 10-1 at 6; *see* Doc. 16 at 23).   Drummond contends environmental regulations affecting coal constitute a "government intervention" or an "interference by civil authorities" triggering the force majeure clause.  (Doc. 16 at 23).   Kinder Morgan argues the narrow construction applied to force majeure events forecloses such an expansive interpretation.  (Doc. 20 at 17-18).

> Under New York law regarding interpretation of force majeure clauses:
>
> When the event that prevents performance is not enumerated, but the clause contains an expansive catchall phrase in addition to specific events, "the precept of *ejusdem generis* as a construction guide is appropriate"—that is, "words constituting general language of excuse are not to be given the most expansive meaning possible, but are held to apply only to the same general kind or class as those specifically mentioned."

*Team Mktg. USA Corp. v. Power Pact, LLC*, 839 N.Y.S.2d 242, 246 (N.Y. App. Div. 2007) (citing *Kel Kim*, 516 N.Y.S.2d at 806); *see Bers v. Erie R.R. Co.,* 225 N.Y. 543, 546 (N.Y. App. Div. 1919) ("when a particular class is spoken of, and general words follow, the class first mentioned is to be taken as the most

comprehensive, and the general words are restricted to those of the same kind (*ejusdem generis*))" (citation omitted).  Accordingly, while the clause at issue here lists force majeure events "without limitation," whether a particular event triggers the clause must be determined in light of the specifically enumerated events.

Drummond contends environmental regulations constitute government "interventions" or "interference by civil or military authorities."  (*See* Doc. 16 at 23).  Applying a broad construction of the terms, this interpretation is probably correct.  However, applying *ejusdem generis* to the contract language at issue here, the general terms "intervention" and "interference" are preceded by more specific events, including embargoes and blockades.  Likewise, both the terms "intervention" and "interference" are followed by the phrase "or other civil unrest." (Doc. 10-1 at 6).  Accordingly, the force majeure clause's inclusion of interventions or interferences as triggering events is qualified by the surrounding terms, which arise in the context of civil unrest or military conflicts.  Moreover, the complaint does not allege that the market for coal is subject to an embargo or blockade. Simply put, environmental regulations do not constitute force majeure events under the circumstances presented here.  *See Walk-In Med. Centers, Inc. v. Breuer Capital Corp.*, No. 84-0730, 1986 WL 2818, at *4 (S.D.N.Y. Feb. 24, 1986) (appropriate to apply *ejusdem generis* where it was "unlikely that the parties could have intended the phrase 'adverse market conditions' to swallow up specified

material events affecting the securities markets, thereby allowing [a party] to terminate its firm commitment underwriting agreement whenever the market declined").

Finally, Kinder Morgan contends that, "where government regulations merely trigger a party's *decisions* to act, rather than force or prohibit certain actions, a force majeure clause will not apply." (Doc. 10 at 18). In support of this argument, Kinder Morgan relies on *Macalloy Corp. v. Metallurg., Inc.,* 728 N.Y.S.2d 14, 14-15 (N.Y. App. Div. 2001). In *Macalloy*, the plaintiff sought declaratory relief under a contract which included a "plant shutdown" as a force majeure event. The appellate court affirmed the trial court's grant of summary judgment for the defendant, finding that the plaintiff voluntarily shut down its plant "due to financial considerations brought about by environmental regulations." In affirming, the appellate court held these circumstances did not constitute a force majeure event and that "financial hardship is not grounds for avoiding performance under a contract." 728 N.Y.S.2d at 14-15.

In response, Drummond contends the reasoning in *Macalloy* is not applicable here because the environmental regulations have led the end users of coal to shut down power plants or switch to other fuel sources. (Doc. 16 at 23-24). Drummond contends it has no control over third-parties' decisions to shut down or cease using imported coal. (*Id.* at 24). Drummond's invocation of the force

majeure clause is based on power plants' decisions to "substantially reduce or eliminate their use of coal." (Doc. 1 at 9). However, the issue here is Drummond's performance. To that end, Drummond seeks to be excused from its contractual duties due, at least in part, to financial considerations caused by environmental regulations. Accordingly, *Macalloy* is instructive and provides an independent basis on which to dismiss Drummond's claim for relief under the force majeure clause.

For the foregoing reasons, Drummond's claim for force majeure is due to be dismissed for failure to state a claim.

### F.   <u>Excused Performance</u>

The complaint alleges Drummond is excused from performing because, in 2015, the River Terminal was unable to handle the minimum volume of coal required under the Schedule. The arguments regarding this claim have evolved over the course of the briefing. Initially, Kinder Morgan moved for dismissal of Drummond's claim for excused performance on two related grounds: (1) it is a breach of contract claim masquerading as a declaratory judgment claim; and (2) the contract provides for monetary damages for Kinder Morgan's alleged breach, making declaratory relief inappropriate. (Doc. 10 at 19-20). After Drummond's response to these arguments, Kinder Morgan argued for the first time on reply that the complaint: (1) does not allege a material breach by Kinder Morgan; and (2)

reveals no justiciable controversy because relief would not alter Drummond's future conduct.  (Doc. 20 at 18-19).  After the court ordered further briefing, Drummond filed a sur-reply arguing the complaint describes an actual justiciable controversy.  (Docs. 31-32).  Each argument is addressed in turn.

As an initial matter, the availability of an alternative remedy does not foreclose relief under the Declaratory Judgement Act, which provides declaratory relief is available "whether or not further relief is or could be sought."  28 U.S.C. § 2201(a); *see* FED. R. CIV. P. 57 ("The existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate.").

Turning to Kinder Morgan's arguments raised for the first time in reply, they rely on the complaint's allegation that Drummond will not deliver any additional coal to the River Terminal.  (Doc. 20 at 18-19).  Under these circumstances, Kinder Morgan contends any breach alleged in the complaint is immaterial and that declaratory relief would not alter Drummond's decision to cease importing coal through the River Terminal.  (*Id.*).  Kinder Morgan's arguments rely on *Orlander v. Staples, Inc.,* 802 F.3d 289, 298 (2d Cir. 2015), in which the court noted that a plaintiff relying on a defendant's breach to discharge further performance must allege a "material breach."  Kinder Morgan further argues that any breach alleged in the complaint is immaterial because it did not injure Drummond.  As Kinder Morgan would have it, because Drummond imported no

coal and stated it would not do so, Kinder Morgan's alleged inability to provide the full terminal capacity set forth in the Schedule was harmless.  (Doc. 20 at 19) (citing *Reyelt v. Danzell*, 533 F.3d 28, 32 (1st Cir. 2008)).

Drummond's sur-reply notes that a material breach provides one—but not the only—justification for rescinding a contract.  (Doc. 32 at 9) (quoting *Babylon Associates v. Suffolk Cty.,* 475 N.Y.S.2d 869, 874 (N.Y. Div. App. 1984) (party seeking rescission "must allege fraud in the inducement of the contract; failure of consideration; an inability to perform the contract after it is made; or a breach of the contract which substantially defeats the purpose thereof").  Drummond relies on the complaint's allegations that Kinder Morgan did not have the required capacity at the River Terminal to show it was unable to perform the contract. These allegations, accepted as true, are sufficient to state a claim under New York law.

Turning to the Declaratory Judgement Act's requirement of an actual controversy, the Supreme Court has noted:

> The difference between an abstract question and a "controversy" contemplated by the Declaratory Judgment Act is necessarily one of degree, and it would be difficult, if it would be possible, to fashion a precise test for determining in every case whether there is such a controversy. Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment . . . .  It is immaterial that frequently, in the declaratory judgment suit, the positions of the

26

parties in the conventional suit are reversed; the inquiry is the same in either case.

*Md. Cas. Co. v. Pac. Coal & Oil Co.,* 312 U.S. 270, 273 (1941) (citation omitted). Whether a claim presents a sufficiently real and immediate controversy is examined on a case-by-case basis. *Muller v. Olin Mathieson Chemical Corp.,* 404 F.2d 501, 504 (2d Cir. 1968).

Here, the complaint alleges that on January 29, 2016, Kinder Morgan sent Drummond an invoice for the 2015 shortfall payment in the amount of $13,782,221.73. Subsequently, Kinder Morgan has noted that the shortfall payments due from Drummond total $23,464,407.19. (Doc. 26 at 2). Drummond has not paid the outstanding invoices. Under these circumstances, the court concludes Drummond's claim for excused performance alleges a sufficiently immediate, actual controversy between adversarial parties. *See State Farm Fire & Cas. Co. v. Silver Star Health and Rehab*, 739 F.3d 579, 583-84 (11th Cir. 2013) (affirming district court's declaration that plaintiff did not owe amounts reflected in outstanding bills).

For the foregoing reasons, Kinder Morgan's motion to dismiss is due to be denied as to Drummond's claim for excused performance.

## IV.   CONCLUSION

For all of the foregoing reasons, Kinder Morgan's motion to dismiss is **GRANTED IN PART** and **DENIED IN PART.** (Doc. 10). Specifically, the

motion is **GRANTED** as to Drummond's claims for frustration of purpose, force majeure, and impossibility, and those claims are **DISMISSED** for failure to state a claim; the motion is **DENIED** as to Drummond's claim for excused performance.

This memorandum opinion and order triggers the running of the deadlines set forth in the Scheduling Order.  (Doc. 25).

**DONE** this 25th day of July, 2017.

STACI  G. CORNELIUS
U.S. MAGISTRATE JUDGE

28